640 A.2d 1251

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Kenneth J. WILLIAMS, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 18, 1993.

Decided April 21, 1994.

1

2

4

6

Frederick J. Lanshe, for K. Williams.
Robert Lee Steinberg, James B. Martin, for Com.

12

Robert A. Graci, for Atty. Gen.

Before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY and MONTEMURO, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

Following a jury trial in the Court of Common Pleas of Lehigh County, appellant, Kenneth John Williams, Sr., was found guilty of murder of the first degree,[1] robbery,[2] theft by unlawful taking or disposition,[3] and receiving stolen property.[4] A sentencing hearing took place after which the jury recommended that appellant be sentenced to death, finding, as an aggravating circumstance which outweighed any mitigating circumstances, that murder was committed in the act of the commission of a felony, i.e. robbery. On June 29, 1990, the Court of Common Pleas of Lehigh County imposed the death sentence in addition to a consecutive sentence of five to ten years on the robbery and related offenses. The present direct appeal ensued. We affirm.

Appellant first argues that the evidence was insufficient to support a verdict of guilt of robbery. This court is required in capital cases to review the sufficiency of the evidence, particularly with respect to the first degree murder conviction. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983) rehearing denied, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). The applicable standard of review is whether, viewing all the evidence in the light most favorable to the Commonwealth as verdict winner, a jury could find every element of the crime beyond a reasonable doubt. *Commonwealth v. Bryant*, 524 Pa. 564, 567, 574 A.2d 590, 592 (1990). Therefore, the evidence surrounding the

1. 18 Pa.C.S. § 2502(a).
2. 18 Pa.C.S. § 3701(a)(1)(i).
3. 18 Pa.C.S. § 3921(a).
4. 18 Pa.C.S. § 3925(a).

murder and the robbery and related convictions will be reviewed.

The crimes of murder and robbery have distinct elements of proof. To prove murder of the first degree, the Commonwealth must demonstrate that the defendant killed with a specific intent to kill. 18 Pa.C.S. § 2502(d). The Commonwealth must show: 1) that a human being has unlawfully been killed; 2) that the person did the killing; and, 3) that the killing was done in an intentional, deliberate and premeditated manner. *Commonwealth v. Mitchell*, 528 Pa. 546, 599 A.2d 624 (1991). If a deadly force is knowingly applied by the defendant to another, the specific intent to kill is as evident as if the defendant stated the intent to kill at the time the force was applied. *Commonwealth v. Meredith*, 490 Pa. 303, 416 A.2d 481 (1980). To prove robbery, the Commonwealth must prove that, in the course of committing a theft, the defendant either inflicted serious bodily injury on another or "physically removed property of another by force." *Commonwealth v. Breakiron*, 524 Pa. 282, 297, 571 A.2d 1035, 1042, cert. denied *Breakiron v. Pennsylvania*, 498 U.S. 881, 111 S.Ct. 224, 112 L.Ed.2d 179 (1990).

The record reflects that the evidence was more than sufficient to support verdicts of both crimes. On October 25, 1983, the body of Edward Miller, a single Mennonite long-distance truck driver from Dundee, Ohio, was found shot to death in a truck trailer located at the Trexler Truck Stop in Kuhnsville, Lehigh County, Pennsylvania. Miller had received one gunshot in the back. The body was discovered by three of Miller's brothers who had come to Pennsylvania from Ohio to search for their brother at motels and truck stops when they had not heard from Miller for a few days. They had reported their brother missing to the Ohio and Pennsylvania State Police, and Pennsylvania State Trooper Karvan responded to the Trexler Truck Stop. Trooper Karvan, in the presence of Miller's brothers, discovered the body. Further investigation of the trailer revealed that there were three bullet holes in the trailer.

14

An autopsy disclosed that: the cause of death was a single .38 caliber gunshot wound to the back; the manner of death was homicide; and, while the date of death could not be determined with absolute certainty, the date of death was approximately October 20, 1983. Forensic pathologist Isidor Mihalakis, M.D., testified that Miller's death was caused when a single .38 caliber bullet pierced his spinal column, pierced his heart, ricocheted off his breast bone and subsequently pierced his heart a second time. Mihalakis established that Miller's death occurred on or about October 20, 1983.

Credible testimonial evidence was produced at trial which traced the movements of appellant prior to and subsequent to October 20, 1983 and placed appellant with Miller. On October 10, 1983, appellant obtained a ride from truck driver Dennis Knowles at a truck stop in Florida. Appellant rode with Knowles until October 14th, when he was dropped off in Kings Dominion, Virginia. Appellant then obtained a ride with another truck driver, James W. Sacco, and traveled with him to the Truck Stop of America near Elkton, Maryland. He then obtained a ride with a truck driver, known only as Jim, for two days from Maryland through Pennsylvania and on to Youngstown, Ohio. When Jim's truck broke down in Ohio, appellant took a ride with an unknown trucker eastward to a rest area on Interstate 80 in Pennsylvania. Here, appellant encountered the victim, Edward Miller, in the early morning hours of October 18, 1983.

Appellant was the last person to ride with Miller. He rode east with Miller and spent the night of October 18 sleeping in Miller's truck. Miller proceeded in the morning of October 19 to Port Jersey, New Jersey, where he unloaded his trailer as appellant slept in the cab of Miller's truck. In mid-afternoon on October 19th, they arrived at Kuhn's Motel in Kuhnsville, Pennsylvania, where Miller checked into the motel and they both spent the night with appellant sleeping in Miller's room.

Several weeks after the October 25th discovery of Miller's body, police officials learned that Miller's telephone credit card and other charge cards were being used in the midwest and southwestern sections of the United States. The use of

the credit card led to the investigation of one Monica Mannion, a female truck driver from Illinois. Pursuant to the information provided by Mannion, the police were able to determine that she had encountered appellant on October 20, 1983 in the area of Bloomsburg, New Jersey. Mannion related to the police that appellant contacted her via Citizens Band (CB) radio and that she followed him from Bloomsburg, New Jersey to the Trexler Truck Stop on the night of October 20, 1983. She testified that on the night of October 20th, appellant was alone and operating the tractor-trailer rig identified as Miller's rig. Mannion further stated that when appellant reached the Trexler Truck Stop, he "bobtailed" [5] the tractor and parked it at the nearby Peter Pan Diner, after having disconnected the trailer on the lot of the Trexler Truck Stop.[6] Mannion positively identified the tractor and trailer in the same locations as they were found on the night Miller's body was discovered.

After meeting Mannion on October 20th, appellant accompanied her west in her rig to Illinois and gave her a flashlight, later identified as being the property of Miller. Telephone calls from appellant to Ms. Mannion were charged to Miller's credit cards. Appellant also possessed other personal property belonging to Miller, identified by members of Miller's family. Such property consisted of a trucker's log book, a baseball-type cap, a suitcase, and other items.

Based upon the circumstantial evidence mentioned above, criminal complaints were filed against appellant on December 7, 1983. About one week later, the Pennsylvania State Police learned of appellant's incarceration on other charges in Louisville, Kentucky. Upon disposition of the charges in Kentucky, appellant waived extradition and was returned to Lehigh

5. The term "bobtail" in trucking vernacular indicates that the trailer portion of the tractor-trailer has been separated or "dropped" from the tractor position. Thus, when one operates a bobtailed tractor, one is driving a tractor without a trailer.

6. Appellant indicated to Mannion that he was driving the tractor-trailer from Bloomsburg, New Jersey, to the Peter Pan Diner as a favor to a friend who would subsequently pick up the rig.

County. Appellant was informed of his rights and was afforded all proper process due to him.

During the next three weeks, appellant made incriminating statements to the state police at the Lehigh County Prison, the substance of which corroborated much of the circumstantial evidence which the police had uncovered. The statements culminated with appellant's admission that he shot Miller in the back.

Appellant gave a detailed confession concerning Miller's homicide to Troopers Levisky and Gerken. Appellant stated that on the night of October 19, 1983, he and Miller had stayed in Kuhn's Motel in Kuhnsville. The appellant indicated that the next day, while at breakfast in the adjacent Peter Pan Diner, they encountered a trucker named Wilkens who agreed to get Miller a load back to Ohio from Philadelphia. Miller and appellant entered the Pennsylvania Turnpike in Miller's truck, followed by Wilkens operating his own rig. The two trucks became separated and Miller and appellant continued to travel on the turnpike. Just prior to the Delaware Valley interchange, appellant convinced Miller he would get Miller a load if the trailer was clean of debris. So, Miller pulled off to clean the trailer.

Miller climbed inside the trailer with a flashlight and appellant climbed in after him. While Miller was in the front right corner of the trailer, he dropped his flashlight and bent down to pick it up. At this moment, appellant, who was in the middle of the trailer, shot Miller in the back with a .38 caliber handgun. Appellant stated he did not know why he shot Miller. He explained that " . . . sometimes I just do things like that . . ." and "the thing that doesn't make sense is that Edward Miller was the nicest person that I ever met."

After the shooting, appellant closed the rear door of the trailer. He drove the rig to the Quakertown area and telephoned his wife, Brenda. Brenda knew he was upset but did not know why, as he did not tell her about the shooting. Brenda gave appellant a telephone number with an 800 area code to call to get help. Appellant did not call for help but

drove instead to New Jersey where he first encountered Mannion. In separate rigs, they drove back to Kuhnsville where appellant abandoned Miller's truck which contained the decedent's body. Then, appellant and Mannion headed west to Illinois.

Many other witnesses testified, including a trucker, Kenneth Weinkle, who picked appellant up few days after the incident in West Memphis, Arkansas. Mr. Weinkle testified that he saw appellant with Miller's brown leather wallet with Miller's credit cards in it. Appellant also tried to trade-in Weinkle's truck.

The evidence was clearly sufficient to support the convictions. The record particularly reflects that: appellant admitted that he killed Miller by shooting him in the back near his heart at close range for no reason; appellant was driving the victim's tractor and trailer on the day and the day after Miller was last seen alive; appellant possessed and used Miller's credit cards; and, Ms. Mannion observed appellant driving Miller's rig, in possession of the victim's personal belongings. The evidence is more than sufficient to support the verdicts of murder of the first degree, robbery and related offenses.

▆▆▆ Appellant next argues that the lower court improperly denied his motion to suppress his statements on the basis that he did not voluntarily and knowingly waive his *Miranda* rights. In determining the voluntariness of a confession and the waiver of *Miranda* rights, a court must consider and evaluate the totality of the circumstances attending the confession and the waiver of the rights. *Commonwealth v. Chacko*, 500 Pa. 571, 459 A.2d 311 (1983). This court, in reviewing a suppression court's determination, is to evaluate whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings. *Commonwealth v. Goodwin*, 460 Pa. 516, 333 A.2d 892 (1975). Finally, in certain circumstances, the use of artifice or deception to obtain a confession is insufficient to make an otherwise voluntary confession inadmissible where the deception does not produce an untrustworthy confession or

offend basic notions of fairness. *Commonwealth v. Jones,* 457 Pa. 423, 322 A.2d 119 (1974).

The record reflects that the suppression court did not err in its ruling. Appellant, who had prior familiarity with *Miranda* rights, received his *Miranda* warnings four times and acknowledged his understanding of his rights when he was interviewed. He conceded that he signed the acknowledgement and waiver, that he had admitted to the killing of Miller, and the statements relating to the killing were accurate. He admitted to the officers that he used a .38 caliber handgun in the shooting and later he sold it to a man in Texas. He concedes that none of the officers physically abused him. The suppression court found no physical or psychological factors which coerced appellant into providing his statements. The suppression court did not err in concluding that appellant's confession was the product of free and unconstrained choice.

Appellant suggests, for the first time, that the confession was involuntary due to the alleged false statements by two state police officers that they possessed a .38 caliber revolver which had been sold to a man in Texas after the killing. The record reveals, however, that appellant gave two different reasons for confessing, neither of which involved police statements. At the suppression hearing, appellant claimed he confessed because of his morbid fear of electrocution. At trial, he claimed he confessed because of threats against his family by Nicholas Getter, a relative of his ex-wife, Brenda Williams. Further, the officers did not tell appellant that they knew the subject gun was the weapon used in the killing. Rather, appellant linked the .38 caliber handgun to the shooting. Appellant has failed to demonstrate how his confession was caused by the statements of the police.

Appellant's third argument is that his right to compulsory process was violated when the trial court refused to delay his trial to secure the presence of Sarah Mammen. Appellant argues that Ms. Mammen, the wife of the proprietor of Kuhn's Motel, was unavailable because she was recuperat-

ing from surgery at the time of trial and was bedfast, and that the trial should have been delayed to allow her to testify. The right to compulsory process guarantees the defendant process to obtain witnesses in his favor but does not grant a defendant the right to secure the attendance and testimony of any and all witnesses. *Commonwealth v. Allen,* 501 Pa. 525, 462 A.2d 624 (1983). *See also United States v. Valenzuela–Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). Further, the grant or denial of a continuance to secure a witness is a matter within the sound discretion of the trial court and will not be reversed in the absence of prejudice or a showing of palpable and manifest abuse of discretion. *Commonwealth v. Sullivan,* 484 Pa. 130, 398 A.2d 978 (1979).

Appellant argues that Ms. Mammen would have testified as to the location of Miller's truck on October 23–25, 1983. Yet, according to the police report on which defense counsel relied to make his proffer on behalf of appellant, Ms. Mammen, at best, could have established that she was unsure whether a truck meeting the description of Miller's truck was in the same location on all three days. The trial court did not err in refusing to delay an already lengthy jury trial to secure Ms. Mammen's testimony, especially since counsel had not interviewed Ms. Mammen and, therefore, did not know precisely what she would say and since her testimony was, according to the court, "not of any great significance."

Appellant's fourth claim is that the trial court improperly admitted into evidence two weapons that were not the murder weapon. Appellant avers that any evidence of a firearm which has been determined not to be the murder weapon is irrelevant and highly prejudicial. The Commonwealth contends that such demonstrative evidence was properly introduced: to corroborate the testimony of various witnesses who positively traced the appellant's path from Tampa, Florida to Kuhnsville, Pennsylvania; to demonstrate appellant's knowledge of, and easy access to, guns; and to corroborate statements made by appellant in his own confession.

20

A weapon shown to have been in a defendant's possession may properly be admitted into evidence, even though it cannot positively be identified as the weapon used in the commission of a particular crime, if it tends to prove that the defendant had a weapon similar to the one used in the perpetration of the crime. Any uncertainty that the weapon is the actual weapon used in the crime goes to the weight of such evidence. *Commonwealth v. Coccioletti*, 493 Pa. 103, 425 A.2d 387 (1981).

The evidence of the guns was relevant to prove that appellant had been at the scene of the killing, that he readily obtained and disposed of handguns, and, that appellant had a .38 caliber handgun at the time of the killing. The first link in the chain was testimony from trucker Dennis Knowles, who testified that he, Knowles, owned a .38 caliber handgun which he had with him when he picked up appellant and which was gone after appellant left his company on October 14th. Knowles also stated that, during his time with Knowles, appellant showed him a .25 caliber handgun. The next link was trucker James W. Sacco, who testified that he gave appellant a ride from Virginia, where appellant left Knowles, to Maryland. During the time they were together, appellant showed Sacco the .38 caliber handgun, and the same .25 caliber handgun, which Sacco bought from appellant. Other links included testimony from trucker Kenneth Weinkle and the gun purchaser. Weinkle testified that he saw appellant with a .38 caliber gun in his possession after the killing. Johnson purchased a .38 caliber gun from appellant and testified that it contained hollow-point bullets. These links, which were demonstrated by the evidence of the two guns, plus the actions of appellant in using Miller's credit cards, paved the way for the Commonwealth to trace the whereabouts of appellant both before and after the killing.

This evidence merely corroborates appellant's confession. Appellant had confessed to police, a confession he sought to recant at trial, that he had sold a .38 caliber revolver to a man in Texas and that he had obtained that revolver by

taking it from a truck driver in Virginia. Introduction of the complained-of evidence corroborates the confession appellant wanted the jury to believe was a lie. Even assuming it was error to have admitted these guns, in light of the overwhelming evidence of appellant's guilt, such error is harmless.

Appellant's fifth argument is that the trial court improperly refused to grant defense counsel's motion at side bar to exclude members of the victim's family, clad in their Mennonite clothing, from the courtroom. The decision to exclude members of the public from a trial, as well as the scope and the duration of an exclusion order, must be left to the sound discretion of the trial court and will not be overturned absent an abuse of discretion. *Commonwealth v. Knight*, 469 Pa. 57, 66, 364 A.2d 902, 907 (1976).

Here, the presence of Edward Miller's family and friends, all of whom were members of the Mennonite religion and dressed in identical attire, was a natural consequence of the fact that Miller was murdered. These people had an interest in the trial and were not loud, boisterous, intimidating or unruly. While appellant argues that the court should have excluded these people from the courtroom to assure him a fair trial, he fails to support his argument with even one reference to the record as to how his trial was unfair because of the presence of these people. No abuse of discretion has been demonstrated.

Appellant's sixth argument is that the prosecutor committed misconduct in eliciting appellant's statements about his desire to receive the death penalty and in the prosecutor's delivery of his closing argument. In order to preserve an issue for review, it must be specifically raised at trial and in post-verdict motions. *Commonwealth v. Gravely*, 486 Pa. 194, 200, 404 A.2d 1296, 1298 (1979). This court can not review a claim that has not been addressed in the lower court and, therefore, this claim has been waived. Since this case is a death penalty case, however, we examine the underlying claim and find it meritless.

Appellant claims that the prosecutor improperly questioned Troopers Levisky and Gerken who took the appellant's confession. Both of the troopers testified that appellant, prior to his confession, stated he would give a statement if he could be guaranteed the death penalty. Evidence which demonstrates a consciousness of guilt is admissible against the accused as circumstantial evidence. *Commonwealth v. Cristina*, 481 Pa. 44, 391 A.2d 1307 (1978) (statements which are not necessarily admissions of guilt may be admissible as probative of guilt.) The testimony of the troopers was both relevant and probative of appellant's guilt of murder, the only crime carrying the death penalty.

Appellant also claims the prosecutor committed misconduct in his closing argument because he questioned why an individual would confess to first degree murder. A new trial is not required because the language of a district attorney is improper; it is required where the unavoidable effect is to prejudice the jury, forming in the minds of the members of the jury a fixed bias and a hostility toward the appellant so that the jury could not weigh the evidence and render a true verdict. *Commonwealth v. Green*, 525 Pa. 424, 459, 581 A.2d 544, 561 (1990). No prejudice or fixed bias in the minds of the jury occurred where the prosecutor corrected himself in closing argument regarding defendant's testimony. *Commonwealth v. Lawson*, 519 Pa. 175, 546 A.2d 589 (1988). In closing argument in appellant's case, the prosecutor questioned why an individual would confess to first degree murder, and then, after an objection by defense counsel, advised the jury that he had misspoken and that it was for the jury to determine what degree of murder appellant had committed. The trial court did not err in concluding that the statement of the prosecutor, coupled with the fact that the prosecutor immediately corrected his misstatement, caused no prejudice or fixed bias in the minds of the jury, particularly in light of the overwhelming evidence of appellant's guilt.

Appellant's seventh argument is that prosecutorial misconduct occurred when the prosecutor asked the jury to

consider "whether the imposition of the death penalty will deter Kenneth Williams from ever again shooting one of the nicest persons he had ever met in the back." [7] Appellant contends that the sentence of death was the product of the passions, prejudices and fears elicited by the prosecutor making direct references to the deterrent effects of the death penalty. The prosecutor is permitted by the terms of the death penalty statute, 42 Pa.C.S. § 9711(a)(3), to argue in favor of the death penalty. It is not improper for a prosecutor to remark about the deterrent effect of the death penalty. *Commonwealth v. Whitney*, 511 Pa. 232, 245, 512 A.2d 1152, 1159 (1986). *See also Commonwealth v. Christy*, 511 Pa. 490, 515 A.2d 832 (1986) (prosecutor's remark in his closing argument that if the defendant did not receive the death penalty, society would again be victimized by the defendant held to be mere "oratorical flair" in pursuing the imposition of the death penalty). Here, the record reflects that the prosecutor's remarks were not improper as they were, at worst, mere oratorical flair. And, even if they were deemed improper, these remarks did not prevent the jury from weighing the evidence and rendering a true verdict.

Appellant's eighth argument is that the trial court improperly instructed the jury during the penalty phase of the proceedings: by not clearly defining for the jury that the determination of mitigating circumstances can be decided individually and does not have to be unanimous; by instructing the jury that the aggravating circumstance of murder in the commission of a felony existed; and by permitting consideration of torture when not defined and not adequately instructed upon as to the burden of proof. 42 Pa.C.S. §§ 9711(c)(1)(i) and (ii) mandate that, before the jury retires to consider the sentencing verdict, the court shall instruct the jury on the aggravating circumstances set out in § 9711(d) as to which there is some evidence, and the mitigating circum-

---

7. During appellant's confession he stated that the "funny thing" about his shooting of Miller was that Miller "was the nicest person that I ever met." The trial court correctly concluded that the prosecutor's reference to such remarks was fair comment on the appellant's confession which was properly entered into evidence.

stances set out in § 9711(e) as to which there is some evidence. Further, if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstances or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances, the verdict is to be death. 42 Pa.C.S. § 9711(c)(1)(iv). Otherwise, the verdict is to be a life sentence.

■ Appellant contends that the trial court improperly instructed the jury during the sentencing phase by not clearly stating that the determination of mitigating circumstances can be decided individually and does not have to be unanimous. The record reflects that the court's instruction was substantially identical to that which is recommended pursuant to the Pennsylvania Suggested Standard Criminal Jury Instructions Guide. Furthermore, the definitions of the applicable standards of proof were made as simple as possible in an attempt not to confuse or overly burden the jury.

■ The appellant next contends that error occurred when the court instructed the jury that the aggravating circumstance of murder in the commission of a felony existed. The record reflects that the court stated: "We have all found the defendant guilty of robbery. That will apply." The reasonable inference is that there was some evidence of this aggravating factor for purposes of sentencing. The court did not say or imply that appellant committed the homicide while in the perpetration of the felony. That decision was properly left to, and made by, the jury.

■ Appellant also contends that error occurred when the court permitted the jury to consider torture as an aggravating circumstance, 42 Pa.C.S. § 9711(d)(8), and when the court instructed on the same. A death sentence is to be reversed only if the jury relied on an unsupported and, therefore, improper aggravating circumstance in rendering its penalty phase verdict. *Commonwealth v. Aulisio*, 514 Pa. 84, 94, 522 A.2d 1075, 1080 (1987). The record reflects that any error which occurred was harmless. Defense counsel first raised the issue of torture as an aggravating circumstance in

the sentencing phase in an attempt to anticipate the prosecutor's closing remarks and to ask the jury not to find the presence of this circumstance. Appellant's counsel's remarks invited the prosecutor's response regarding torture which was based on the testimony of a forensic pathologist who indicated that the victim, on being shot, suffered extreme pain and eventually experienced a sense of impending doom. It was erroneous to submit this aggravating circumstance to the jury on such evidence. As evidenced by the jury's verdict slip entered in this case, however, torture was not found as an aggravating circumstance; rather, only murder in the perpetration of a felony was found as an aggravating circumstance which outweighed any mitigating circumstances. Therefore, it was harmless error to submit torture as an aggravating circumstance to the jury. There is no merit to any of appellant's contentions.

Appellant's ninth argument is that the trial court abused its discretion in refusing to grant a new trial on the basis of after-discovered evidence. After-discovered evidence can be the basis for a new trial if it: 1) has been discovered after the trial and could not have been obtained at or prior to the conclusion of the trial by the exercise of reasonable diligence; 2) is not merely corroborative or cumulative; 3) will not be used solely to impeach the credibility of a witness; and 4) is of such nature and character that a different verdict will likely result if a new trial is granted. *Commonwealth v. Mosteller*, 446 Pa. 83, 284 A.2d 786 (1971).

Appellant contends that Miller was actually murdered by John Schissler, the purported pimp of a prostitute with whom Miller allegedly had sexual relations on the night of his murder. A hearing was held on February 17, 1987, and appellant offered the testimony of inmates Manuel Abrante and Milton Washington to support his contentions.

At the time of the hearing, Abrante was serving a sentence at the Huntingdon state correctional facility on two rape charges and an escape charge. Appellant and Abrante had met briefly at the Lehigh County Prison and befriended

26

one another. Abrante testified that, while at Huntingdon, he and Schissler had several conversations. Abrante testified that Schissler indicated during the conversations that he, Schissler, robbed and killed Miller.[8] Six days after the hearing, Abrante informed the district attorney's office that he had perjured himself and wished to recant his testimony. At a hearing held the next day, Abrante admitted in open court under oath that he perjured himself at the prior hearing. He further indicated that he fabricated the entire story as to what Schissler said regarding Miller's death because of a personal vendetta he had against Schissler.[9] Thus, Abrante's testimony was unreliable because it was hearsay testimony and recanted.

Appellant then argues that, in any event, he was entitled to a new trial to permit the testimony of Washington, which was not recanted. Washington, at the time of the hearing, was being held in the Lehigh County Prison on murder charges. He has subsequently been found guilty of murdering a prostitute named Tina Metzger, his one-time girlfriend. Appellant and Washington also became acquainted in the Lehigh County Prison. Washington testified that, while in prison, he made approximately ten to twenty phone calls to Tammy Marie Schenkel, whom he had met through Tina Metzger. He testified that Schenkel told him during phone conversations that she was present when Miller was killed and appellant did not do it.[10]

8. Abrante's testimony as to Schissler's out-of-court statement constituted hearsay testimony. This type of out-of-court statement is traditionally excluded because the statements lack the conventional indicia of reliability. Declarations against penal interest are admissible as an exception to the hearsay rule only where there are existing circumstances that provide clear assurances that such declarations are trustworthy and reliable. *Commonwealth v. Bracero*, 515 Pa. 355, 528 A.2d 936 (1987). The record reflects that the reliability of Abrante's hearsay statements was not demonstrated in appellant's case.

9. Appellant contends that Abrante's recanted testimony was unreliable because it involved an admission of perjury. The record reflects no evidence supporting appellant's contention.

10. This testimony is also inadmissible hearsay. While the alleged statements of Schenkel implicate her in prostitution and complicity to murder and arguably can be considered declarations against penal

Tammy Marie Schenkel and John Schissler also appeared and testified at the February 17 hearing. Schenkel denied having ever conversed with Washington and further denied having any knowledge regarding Miller's death. Schissler testified he had no knowledge of Miller's death and never admitted to having killed Miller. The testimony of Schenkel and Schissler is far more credible and reliable than the hearsay testimony offered by Abrante and Washington. The trial court did not err in rejecting the appellant's motion for a new trial based on after-discovered evidence.

Appellant's last argument is that he was deprived of effective assistance of counsel. According to *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987) and its progeny, the defendant must demonstrate: 1) that the underlying claim is of arguable merit; 2) that counsel's performance was unreasonable; and, 3) that counsel's ineffectiveness prejudiced defendant. Mere inexperience of counsel does not, in itself, establish ineffectiveness. *Commonwealth v. Clemmons*, 505 Pa. 356, 479 A.2d 955 (1984). An evidentiary hearing is not mandated in every case that ineffectiveness of counsel is raised.

Appellant contends that trial counsel was ineffective because he failed to interview necessary and material witnesses. Appellant claims that counsel was ineffective because he failed to interview Nicholas Getter, a relative of appellant's ex-wife who allegedly made threats against Brenda Williams and their son which induced the appellant to make incriminating statements. He also contends trial counsel should have interviewed trucker Wilkens, with whom he had breakfast on the day of the killing, Tammy Marie Schenkel, John Schissler, and witnesses from the Bureau of Alcohol, Tobacco and Firearms, the Drug Enforcement Agency, or other governmental agencies. At no point in his argument does appellant demonstrate how any of these witnesses would have assisted the defense.

interest, the necessary circumstances that would provide clear assurance that such declarations are trustworthy and reliable are not present.

The record reflects that the testimony from these people could not have assisted the defense. Testimony about threats from Getter went to the voluntariness of appellant's confession and would have contradicted testimony appellant provided at a pretrial suppression hearing that he confessed because he feared the electric chair. Wilkens would only have established that appellant and Miller were in the Peter Pan Diner on the morning of the murder but would not have established any alibi. The testimony of Schenkel and Schissler was heard by the trial court in an after-discovered evidence hearing and their testimony would not have assisted appellant. (Indeed, counsel did interview Schissler and appellant tried to convince Schissler to testify at the time of trial without success.) Appellant has failed to demonstrate any error.

Appellant also claims that counsel was ineffective because of his trial strategy, and because of his failure to prepare defense witnesses, to obtain a continuance to delay commencement of trial, and to investigate his case. Testimony which the defendant believes was not helpful by hindsight does not lay the groundwork for an allegation of ineffectiveness. *Commonwealth v. Ly*, 528 Pa. 523, 599 A.2d 613 (1991). Counsel's assistance is deemed constitutionally effective once it can be concluded that a particular course chosen by counsel had some reasonable basis designed to effectuate his client's interests. *Commonwealth v. Savage*, 529 Pa. 108, 602 A.2d 309 (1992).

Appellant makes no showing that any of these claims has merit. The record reflects no evidence that appellant was prevented from presenting any substantive testimony or evidence which would have contributed to the presentation of an alibi defense. Also, the record reflects no basis for a claim that he would have been entitled to a continuance or that he was prejudiced by counsel's failure to request a continuance. The trial court concluded that counsel's examination and cross-examination of witnesses was "thorough and exacting," and that counsel appeared "well-organized and aptly prepared." Further, following a review of the record as a whole, the trial court could not say that the course of conduct of

appellant's trial counsel had no reasonable basis designed to effectuate his client's interests and refused to second-guess trial counsel's strategic maneuvering. Appellant has demonstrated no error.

Appellant also claims trial counsel was ineffective because he should have familiarized himself with appellant's medical history and should have had appellant psychologically examined. Counsel is not ineffective for failing to assert a defense that would not have been beneficial or for failing to interview witnesses whose testimony would not have been helpful. *Commonwealth v. McNeil*, 506 Pa. 607, 487 A.2d 802 (1985). The record reflects no evidence which would have enabled defense counsel to offer a defense of diminished capacity, mental infirmity, insanity or incompetence. Appellant's defense was that he did not commit the murder, not that he did it and was insane. Further, it cannot be said that in light of all the alternatives available to trial counsel, the strategy actually employed by him was so unreasonable that no competent lawyer would have chosen that course of conduct.

Appellant next argues that counsel was ineffective for failing to retain expert witnesses and to familiarize himself with the Commonwealth's witnesses. When a defendant claims that some sort of expert testimony should have been introduced at trial, the defendant must articulate what evidence was available and identify the witness who was willing to offer such evidence. *Commonwealth v. Holloway*, 524 Pa. 342, 572 A.2d 687 (1990). Further, trial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony. *Commonwealth v. Clemmons*, 505 Pa. 356, 479 A.2d 955 (1984). Appellant has not satisfied the *Holloway* standards. Further, the record reflects that trial counsel extensively cross-examined expert prosecution witnesses, Trooper Krebs and Dr. Mihalakis. No error has been shown.

Appellant argues that trial counsel was ineffective for failing to request a "mercy charge" on the lesser offenses of

voluntary and involuntary manslaughter as required by *Commonwealth v. Jones,* 457 Pa. 563, 319 A.2d 142 (1974). Therefore, appellant argues, since counsel did not request the "mercy charge," counsel was ineffective.

In *Jones,* this court held that a criminal defendant charged with murder is entitled to have his jury charged on voluntary manslaughter and involuntary manslaughter on request of counsel without regard to the evidence presented at trial. The rationale for this ruling was that the jury has the power to reach a compromise verdict and had "mercy dispensing power." This court subsequently limited *Jones* by ruling that such instructions may only be given when the evidence would support such a verdict. *See Commonwealth v. Carter,* 502 Pa. 433, 466 A.2d 1328 (1983) (trial court may charge on voluntary manslaughter only where evidence exists to support such a verdict) and *Commonwealth v. White,* 490 Pa. 179, 415 A.2d 399 (1980) (trial court may charge on involuntary manslaughter only where evidence exists to support such a verdict). In appellant's case, the record reflects no evidence, and appellant has referred to no evidence, which would support a verdict of voluntary or of involuntary manslaughter. Accordingly, had defense counsel requested a charge on either voluntary or involuntary manslaughter at trial, it would have been denied. Counsel is not ineffective for failing to make a futile request.

▪▪▪ Appellant also argues that counsel was ineffective for conceding the death penalty. The record reflects that, in his statement to the sentencing jury, counsel conceded that, by virtue of the verdicts of homicide and robbery, the aggravating factor of 42 Pa.C.S. § 9711(d)(6) was present. He then attempted to establish several mitigating factors in the appellant's favor to outweigh the aggravating factor. It cannot be said that such strategy had no reasonable basis designed to effectuate his client's interests.

▪▪▪ Finally, appellant argues that counsel was ineffective for failing to poll the jury after the death verdict was entered. An accused has an absolute right to poll the jury to ensure that each juror voluntarily has joined in the verdict as

written and announced. *Commonwealth v. Martin,* 379 Pa. 587, 109 A.2d 325 (1954). Failure to do so, however, does not constitute ineffectiveness of counsel in the absence of other factors. Here, the verdict slip contained the signatures of all twelve jurors. Appellant has demonstrated no error and, indeed, no prejudice. In summary, appellant has not demonstrated any violation of his right to effective assistance of counsel.

█ We now comply with our duty under 42 Pa.C.S. § 9711(h)(3)(iii) to review sentences of death from the standpoint of proportionality to sentences imposed in similar cases. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 63, 454 A.2d 937, 961 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). We have reviewed the sentence imposed on appellant in light of sentencing data compiled and monitored by the Administrative Office of Pennsylvania Courts. *See Commonwealth v. Frey,* 504 Pa. 428, 443, 475 A.2d 700, 707–08 (1984). We perceive no excess or disproportionality in the sentence imposed. Further, the record does not provide any basis for belief that the sentence of death was the "product of passion, prejudice or any other arbitrary factor." *See* 42 Pa.C.S. § 9711(h)(3)(i). Also, the evidence supports the finding of at least one aggravating circumstance specified in 42 Pa.C.S. § 9711(d) and of no mitigating circumstances. *See* 42 Pa.C.S. § 9711(h)(3)(ii). Accordingly, the sentences must be affirmed.

The order of the Court of Common Pleas of Lehigh County is affirmed.[11]

LARSEN, J., did not participate in the decision of this case.

MONTEMURO, J., who was an appointed justice of the court at the time of argument, participated in the decision of this case in his capacity as senior justice.

11. The Prothonotary of the Supreme Court is directed to transmit the complete record in this case to the Governor, 42 Pa.C.S. § 9711(i).